NOT FOR PUBLICATION

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| NASC SERVICES, INC., | **Hon. Dennis M. Cavanaugh** |
| Plaintiff, | **OPINION** |
| v. | Civil Action No. 07-CV-5793 (DMC) |
| DAVID JERVIS, *et al*., | |
| Defendants. | |

<u>DENNIS M. CAVANAUGH, U.S.D.J.</u>:

This matter comes before the Court upon Plaintiffs NASC Services, Inc. d/b/a MLS Camps, and its president Gary Russell's (collectively "Plaintiffs") motion to preliminarily enjoin their former employees, Defendants David Jervis, Adrian Moses, Simon Barrow, Simon Nee, Steven Jones and Benjamin Moffett (collectively "Defendants"), from violating their noncompetition, nonsolicitation and nondisclosure agreements with Plaintiffs; and Defendants' motion to dismiss Counts IV through XIII of Plaintiff's Complaint. Oral argument was heard on January 8, 2008. After carefully considering the submissions of the parties, and based upon the following, it is the finding of this Court that Plaintiffs' motion to preliminarily enjoin Defendants is **denied**; and Defendants' motion to dismiss Counts IV through XIII of Plaintiff's Complaint is **granted**.

**I.     BACKGROUND**[1]

Plaintiffs operate soccer camps, providing soccer instruction to youths throughout the United States. Russell began the soccer camp program in 1969 and, over the years, grew his business into a large organization. The New York/New Jersey area is one of Plaintiffs' most active regions. In this area, Plaintiffs provided soccer camp services to roughly 185 soccer clubs in the past year, which accounted for approximately $1.5 million in annual revenue.

Defendants are citizens of the United Kingdom. They have played, taught, coached and worked in the soccer industry most of their lives. Plaintiffs hired Defendants to provide services for Plaintiffs' soccer camps in the New York/New Jersey area. Each of the Defendants entered into an employment contract with Plaintiff, which included three relevant covenants, namely a covenant not to compete with Plaintiffs, a covenant not to solicit Plaintiffs' customers and a covenant not to disclose Plaintiffs' confidential information. Plaintiffs placed Defendants in positions where they were responsible for developing and nurturing Plaintiffs' relationships with its customers in this area. Some of Defendants were stationed in Red Bull New York ("Red Bull"), a soccer organization in Secaucus, New Jersey to which Plaintiffs provided soccer camp services. Although Defendants worked at the Red Bull facilities, they were Plaintiffs' employees.

---

[1] The facts set-forth in this Opinion are taken from the Parties' statements in their respective moving papers.

2

Between August and November of 2007, Defendants separated from Plaintiffs and assumed positions with the Red Bull. Though their specific reasons for leaving Plaintiffs differ, Defendants all wished to distance themselves from Russell, MLS Camps' owner, because of alleged mistreatment, deception, bullying and abuse. Defendants contend that the litany of material breaches of Plaintiffs' contractual obligations and duty of good faith and fair dealing owed to Defendants between 2006 and 2007 is extraordinary. Defendants request that this Court reject Plaintiffs' application in its entirety for several reasons: Defendants continued employment with the Red Bull is essential to their continued immigration status because the Red Bull assumed sponsorship of their visas; the noncompetition clauses are grossly overbroad; there is no basis to enforce the noncompetition clauses because Defendants took no proprietary or confidential teaching curriculum, client list, sales projections or data or presentation material because everything that Plaintiffs purport to be "confidential" is available for purchase from one of Russell's websites; detailed information concerning each of Plaintiffs' clients is available *via* the Internet; it is not "inevitable" that Defendants will disclose Plaintiffs' "Strengths-Based Coaching" to the Red Bull because they have their own system in place; the two-year limitation is longer than necessary to protect Plaintiffs' business concerns; on November 7, 2007, Russell instructed Defendants that they could work directly for Red Bull; Russell fired or forced-out most of Plaintiffs' senior management team and each of the executives assumed employment with other companies in the soccer industry, but Plaintiffs have failed to enforce the same post-separation restraints against many of them; and Defendants allege that it is specious that Plaintiffs claim that Defendants will cause irreparable harm to its business reputation.

Plaintiffs allege that, since Defendants left their employment with Plaintiffs, Plaintiffs have experienced an immediate drop in customers in the New York/New Jersey area. Furthermore, Plaintiffs did not authorize Defendants to work for a direct competitor, Red Bull, in violation of their noncompetition covenants, to draw-away Plaintiffs' customers in violation of their nonsolicitation covenants or to disclose Plaintiffs' confidential information in violation of their confidentiality agreements.

Following oral argument on January 8, 2008, the parties attempted to mediate the claims at issue before Judge John E. Keefe, Sr. (retired) of Keefe Bartels & Clark LLC. The mediation, however, was unsuccessful.

**II.  STANDARD OF REVIEW**

A court should grant preliminary injunctive relief where (1) the plaintiff has a reasonable probability of success on the merits, (2) the plaintiff faces immediate and irreparable harm, (3) the harm to the plaintiff outweighs any potential harm to the defendants and (4) the public interest favors granting the plaintiff preliminary relief. See, e.g., Instant Air Freight Co. v. C.F. Air Freight, Inc., 882 F.2d 797, 800 (3d Cir. 1989).

**III.  DISCUSSION**

    A.  Applicable Substantive Law

Each of the contracts (noncompetition, nonsolicitation, nondisclosure) contains several identical provisions. Section 9 of the Contract states that they "shall [be] interpreted [sic] in accordance with and governed by the substantive laws of the State of Connecticut." (Complaint, Exhs. A-F.) Plaintiffs ignored that provision of the Contract and their application instead seeks relief

under New Jersey law. See U.S. Surgical Corp. v. Imagyn Med. Techs., Inc., 25 F. Supp. 2d 40, 46-47 (D. Conn. 1998).

      B.      Plaintiffs' Probability of Success on the Merits

Plaintiffs need only show a "reasonable probability" of prevailing on the merits in order to satisfy this factor. See E.R. Squibb & Sons, Inc. v. Hollister, Inc., 1991 U.S. Dist. LEXIS 1395, *4-*5 (D.N.J. 1991). "It is not necessary that the moving party's right to a final decision after trial be wholly without doubt; rather, the burden is on the party seeking relief to make a *prima facie* case showing a reasonable probability that it will prevail on the merits." Oburn v. Shapp, 521 F.2d 142, 148 (3d Cir. 1975).

Defendants entered into employment agreements with Plaintiff, in which they agreed not to compete with Plaintiffs, not to solicit Plaintiffs' customers and not to disclose Plaintiffs' confidential information. In breach of these promises, each of the Defendants, upon leaving Plaintiffs' employ, immediately joined Red Bull to help it launch soccer camps in the New York/New Jersey area – in direct competition with Plaintiffs. Plaintiffs argue that Defendants have begun to solicit a significant amount of business from Plaintiffs. Plaintiffs argue that Defendants, in the course of their new employment with Red Bull, will inevitably use and disclose information about Plaintiffs' clients, students and training techniques, as well as other confidential information.

      1.      Noncompetition Covenants

"An employer's ongoing professional relationship with its clients is generally recognized as a legitimate business interest which may be protected through a restrictive covenant." Mailman, Ross, Toyes & Shapiro v. Edelson, 183 N.J. Super. 434, 440 (Ch. Div. 1982). Every employer "has

a patently legitimate interest in protecting his trade secrets as well as his confidential business information and he has an equally legitimate interest in protecting his customer relationships." Whitmyer Bros., Inc. v. Doyle, 58 N.J. 25, 33 (1971).

Plaintiffs argue that the covenants are reasonable both as to duration and geographic extent. Plaintiffs' soccer camp business is nationwide, with special concentration in the New York/New Jersey area. Furthermore, a two-year limitation is reasonable. See Mailman, Ross, Toyes & Shapiro, 183 N.J. Super. at 440.

According to Defendants, however, the noncompetition clauses appear to be unreasonable because they are unnecessary to protect Plaintiffs' legitimate business interest. Defendants provide no unique services nor possess any extraordinary skills that could harm Plaintiffs if they continue to work for the Red Bull or for any other employer in the soccer industry. Under Connecticut law, it would be an extraordinary stretch to extend mandatory injunctive relief under these circumstances. See Century 21 Access Amer. v. Garcia, Civ. Action No. 4000081, 2004 WL 1966048, at *2 (Conn. Super. Ct. Aug. 6, 2004) (enforcing noncompetition restriction unnecessary because "the employee's services were not deemed special, extraordinary or unique"). Plaintiffs nonetheless claim that the noncompetition clauses must be enforced because Defendants possess allegedly confidential information concerning Plaintiffs' methods of teaching soccer.

Plaintiffs have no legitimate protectable interest in preventing Defendants from continuing to teach children how to play soccer. See Town & Country House & Homes Serv., Inc. v. Evans, 150 Conn. 314, 318 (1963). In the course of their work for MLS Camps, Defendants were not exposed to information that represents a trade secret. Their jobs required them to coach, teach, organize, sell

6

and manage youth soccer camps. There is nothing confidential about how to teach soccer. Moreover, the "secrets" of Russell's allegedly proprietary "Strengths-Based Coaching" program are readily available to anyone. For a nominal fee, anyone can sign-up *via* one of Russell's websites to purchase all of the materials necessary to master Russell's program. Russell's teaching methodology is nothing more than a collection of practices obtained from a variety of public sources. Likewise, Plaintiffs' "client-list" constitutes nothing more than names of area soccer clubs who might be interested in youth programs, clinics or camps for children in their programs. It appears likely that Plaintiffs' list could be easily replicated from the vast array of information available *via* the Internet. See Heritage Benefit Consultants, Inc. v. Cole, Civ. Action No. 162270S, 2001 WL 237240, at *8 (Conn. Super. Ct. Feb. 23, 2001). Furthermore, Plaintiffs have not submitted evidence that Defendants misappropriated confidential or proprietary information. Defendants claim that they have not divulged any information to Red Bull that they acquired from Plaintiffs and that they have no intention in doing so. Likewise, Defendants claim that none of Red Bull's employees have asked them to disclose any of Plaintiffs' information.

Furthermore, Defendants argue that Plaintiffs are responsible for a number of material breaches of their contractual obligations and the duty of good faith and fair dealing.

        2.     Nonsolicitation Covenants

Nonsolicitation agreements are designed to protect an employer's existing client base. For example, in A.T. Hudson & Co. v. Donovan, the court upheld a nonsolicitation agreement, noting that employers "expend great energy and money in soliciting clients and developing projects for their benefit. Each client that plaintiff is able to attract represents a significant investment of time, effort

7

and money which is worthy of protection." 216 N.J. Super. 426, 428, 434 (App. Div. 1987). In Coskey's Tele. & Radio Sales and Serv., Inc. v. Foti, the Court upheld an injunction to the extent that it "restrains [ex-employee] from interfering with any ongoing contract, including any modifications thereof, in which he had participated on behalf of [employer] during his employment." 253 N.J. Super. 626, 637, 639 (App. Div. 1992).

According to Plaintiffs, Defendants' presence with Plaintiffs' competitor, Red Bull, is itself a drawing card for customers. Defendants held positions of great responsibility with Plaintiffs that entailed significant exposure to and dealings with Plaintiffs' customers. Their sudden disappearance from Plaintiffs' employ and reappearance in the employ of Plaintiffs' competitor carries with it the inevitable implication that they are the heir to Plaintiffs' business. This appearance is reinforced by Defendants' overt attempts to divert Plaintiffs' customers.

According to Defendants, however, Plaintiffs' "client-list" is nothing more than names of area soccer clubs who might be interested in youth programs, clinics or camps for children in their programs. It appears likely that Plaintiffs' list could be easily replicated from the vast array of information available *via* the Internet. See Heritage Benefit Consultants, Inc., Civ. Action No. 162270S, 2001 WL 237240, at *8.

### 3. Nondisclosure Covenants

Nondisclosure agreements protect the employer against the former employee disclosing proprietary information to competitors – information such as client lists, techniques, methods and trade secrets that the employer has labored for years to develop. Where disclosures of proprietary information are inevitable, it is appropriate for the Court to protect the plaintiff employer's interests

8

with preliminary injunctive relief. See Doeblers Pa. Hybrids, Inc. v. Doebler Seeds, LLC, 88 Fed. Appx. 520, 522 (3d Cir. 2004).

Plaintiffs argue that Defendants held high-level positions with Plaintiffs, so as in Doeblers, Defendants have accrued from their positions of responsibility significant insights into Plaintiffs' strategic goals, planning and methods of implementation. Plaintiffs' proprietary methods, for example, blend psychological assessment of the students with training in order to realize the students' full potential. Having gained this experience and information, Defendants' performance of duties for a competitor will, over time, inevitably entail disclosures of Plaintiffs' confidential, proprietary information.

According to Defendants, however, in the course of their work for Plaintiffs, Defendants were not exposed to information that constitutes a trade secret. Their jobs required them to coach, teach, organize, sell and manage youth soccer camps. There is nothing confidential about how to teach soccer. Moreover, the "secrets" of Russell's allegedly proprietary "Strengths-Based Coaching" program are readily available to anyone. For a nominal fee, anyone can sign-up *via* one of Russell's websites to purchase all of the materials necessary to master Russell's program. Russell's teaching methodology is nothing more than a collection of practices – obtained from a variety of public sources – which, in Russell's opinion, work best. Furthermore, Plaintiffs have not submitted evidence that Defendants misappropriated confidential or proprietary information. Defendants claim that they have not divulged any information to Red Bull that they acquired from Plaintiffs and that they have no intention on doing so. Likewise, Defendants claim that none of Red Bull's employees have asked them to disclose any of Plaintiffs' information.

9

C.     Irreparable Harm if Defendants are Not Enjoined

Plaintiffs claim that Defendants' breaches of their covenants will cause irreparable harm to Plaintiffs. "Grounds for irreparable injury include loss of control of reputation, loss of trade, and loss of goodwill." Pappan Enters., Inc. v. Hardee's Food Sys., Inc., 143 F.3d 800, 805 (3d Cir. 1998). Moreover, "the loss of market share may be an irreparable injury." Ride The Ducks of Phila., LLC v. Duck Boat Tours, Inc., 138 Fed. Appx. 431, 434 (3d Cir. 2005) (unpublished).

Plaintiffs argue that Defendants' defection to Plaintiffs' competitor will entail all of the above harms. Over the years, Plaintiffs have built a significant amount of public goodwill in their youth soccer camp programs. Defendants were the public face of Plaintiffs' programs. Their presence at Red Bull implies that Red Bull's soccer camp programs are still being provided by Plaintiffs, instead of by a new competitor and trades on the goodwill built by Plaintiffs. Moreover, New York/New Jersey and the surrounding states account for a significant share of Plaintiffs' soccer camp business, customers and revenue – in excess of $1.5 million annually. Defendants are intentionally diverting this market share, posing significant loss of revenue to Plaintiffs. This Court considered such irreparable harm in the context of noncompetiton agreements:

> Should [the former employee] start communicating with vendors and other business entities on behalf of [the competitor], when just months ago he was likely contacting these same entities on behalf of Plaintiff, there is a risk that this will affect these parties' perception of Plaintiff's industry reputation. Accordingly, the Court finds that if it does not grant the relief requested by Plaintiff in enjoining [the employee] from violating the Non-Compete Provision, Plaintiff will suffer an immediate, irreparable harm.

Scholastic Funding Group, LLC v. Kimble, 2007 U.S. Dist. LEXIS 30333 at *24 (D.N.J. 2007) (unpublished).  Here, Defendants gained their reputation in this area by working for Plaintiffs and

are now using that reputation to divert business away from Plaintiffs based solely on their presence with the competitor. Defendants' ongoing and inevitable violation of the nondisclosure covenant poses the very sort of irreparable harm that warrants preliminary relief.  Through their positions of authority with Plaintiff, Defendants gained invaluable experience and insights into Plaintiffs' methods and strategies for promoting and running soccer camps.  This knowledge, gained over time, is not something that can be divulged all at once to the start-up competitor, but rather revealed in Defendants' day-to-day interaction with the new, startup competitor.

According to Defendants – and more likely – Plaintiffs cannot demonstrate imminent, substantial and irreparable harm sufficient to warrant a mandatory injunction. Plaintiffs cannot demonstrate imminent harm because they inordinately delayed filing suit. Russell knew by October that Jervis had begun work for the Red Bull  and Russell personally told Barrow, Moffett and Nee as early as November 7 that they could work for the Red Bull . Plaintiffs nonetheless delayed obtaining their "emergency" order to show cause until December 10, 2007 and they were willing to wait for the Court to set a hearing on January 8, 2008. These circumstances belie the notion that any harm to Plaintiffs is "imminent." See Mackin v. Town of Griswold, Civ. Action No. 558342, 2001 LEXIS 1704, *7 (Conn. Super. Ct. June 19, 2001). Furthermore, Plaintiffs cannot demonstrate irreparable harm because their Complaint seeks compensatory damages. It is well-settled that "an injunction will not lie where there is an adequate remedy at law." Cheryl Terry Enters. Ltd. v. City of Hartford, 270 Conn. 619, 650 (2004).

D.       Whether the Alleged Irreparable Harm to Plaintiffs Outweighs Harm to Defendants

Plaintiffs posit that Defendants' deliberate decision to move to a new competitor of Plaintiffs poses a severe hardship to Plaintiffs, which outweighs any harm to Defendants. For example, this Court has found that "Plaintiff, [and its competitors] are all companies attempting to establish a foothold in the student loan servicing telemarketing industry. If the Court were to allow [plaintiff's former employee] to resume employment with [a competitor], this would undoubtedly cause hardship for Plaintiff which outweighs any harm to [the former employee]. See Scholastic Funding Group, LLC v. Kimble, 2007 U.S. Dist. LEXIS 30333 (D.N.J. 2007). Defendants knew of their contractual duties to Plaintiffs and assumed the risk of seeking employment with a direct competitor. The Third Circuit stated that "the injury a defendant might suffer if an injunction were imposed may be "discounted by the fact that the defendant brought the injury upon itself." Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co., 290 F.3d 578, 596 (3d Cir. 2002). "[T]he [defendant] can hardly claim to be harmed, since it brought any and all difficulties occasioned by the issuance of an injunction upon itself." Opticians Ass'n of Am. v. Indep. Opticians of Am., 920 F.2d 187, 197 (3d Cir. 1990). Here, Defendants are not barred from working in the soccer industry, but rather "only from performing similar services for a direct competitor of Plaintiff's." Scholastic Funding Group, 2007 U.S. Dist. LEXIS 30333 at *15 (D.N.J. 2007).

According to Defendants – and more likely – the balancing of the equities supports denial of Plaintiffs' application for injunctive relief. If Plaintiffs' application is granted, Defendants will be forced to stop working for the Red Bull and be barred from working for any comparable business in any capacity in any part of the world. Five of the six Defendants will also be forced to leave the

United States because their visas depend upon their employment. This would create an oppressive and unfair scenario for Defendants.

   E. <u>Public Policy Considerations</u>

   There are strong public policy reasons for supporting noncompetition agreements. Such legally enforceable agreements make it possible for an employer to hire and train employees, to entrust them with responsibilities and to work with them in developing marketing strategies, secure in the knowledge that they will not, having gained these confidences, take them to a competitor's establishment and turn them against their former employer. Thus, "Judicial enforcement of non-competition provisions of employment contracts serves the public interest by promoting stability and certainty in business and employment relationships." [T]he public interest is best served by enforcement of the Agreement via preliminary injunctive relief." <u>Scholastic Funding Group</u>, 2007 U.S. Dist. LEXIS 30333 at *33-*34 (D.N.J. 2007).

   In the current case, however, the balancing of the equities supports denial of Plaintiffs' application for injunctive relief. If Plaintiffs' application is granted, Defendants will be forced to stop working for the Red Bull and be barred from working for any comparable business in any capacity in any part of the world. Five of the six Defendants will also be forced to leave the United States because their visas depend upon their employment. This would create an oppressive and unfair scenario for Defendants.

F.      Dismissal of Counts IV through XIII of Plaintiffs' Complaint

Dismissal of Counts IV through XIII of Plaintiffs' Complaint is warranted because those claims may only be pursued through arbitration in Connecticut. Section 6 of the Contract requires that "all controversies or claims arising out of or relating to this Agreement or the Employee's employment or termination thereof . . . shall be settled by final arbitration in accordance with the Arbitration Rules of the American Arbitration Association ("AAA"). . . . The arbitration shall be held in the City of Mystic, Connecticut, and shall be private." The Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq.* "establishes an 'emphatic' national policy favoring arbitration which is binding on all courts, State and Federal." Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1 (1983). Under the FAA, when a party to a valid arbitration agreement asserts claims in a judicial forum which fall within the scope of the agreement, as Plaintiffs have done here, the FAA requires the court to compel arbitration. See 9 U.S.C. §§ 3 and 4 (1970).

**IV.    CONCLUSION**

For the reasons stated, it is the finding of this Court that Plaintiffs' motion to preliminarily enjoin Defendants is **denied**; and Defendants' motion to dismiss Counts IV through XIII of Plaintiff's Complaint is **granted**. An appropriate Order accompanies this Opinion.

S/ Dennis M. Cavanaugh
Dennis M. Cavanaugh, U.S.D.J.

Date:       May   16  , 2008
Orig.:      Clerk
cc:         All Counsel of Record
            Hon. Mark Falk, U.S.M.J.
            File